BATES v. SAN PEDRO, LOS ANGELES & SALT LAKE RAILROAD COMPANY.

No. 2124.   Decided March 10, 1911 (114 Pac. 527).

1. RAILROADS—CROSSING ACCIDENT—DUTY OF TRAVELER. It is not sufficient for a traveler in attempting to cross a railroad track to look in one direction. It is his duty to look in both directions, and he must select a position from which an effective observation can be made, and he must look out for all trains, and cannot assume that trains will pass only at specified times. (Page 573.)

2. RAILROADS—CROSSING ACCIDENT—QUESTION OF LAW. While ordinarily the question whether under all the circumstances a traveler has exercised due care in attempting to cross a railroad track is for the jury, where the facts are not in dispute and reasonable men cannot differ upon the proposition that, if the traveler had looked or listened, he must have discovered the approaching train in time to have avoided a collision, the question of his negligence is one of law. (Page 573.)

APPEAL from District Court, Third District; *Hon. C. W. Morse,* Judge.

Action by Ormus Bates against the San Pedro, Salt Lake & Los Angeles Railroad Company.

Judgment for plaintiff. Defendant appeals.

REVERSED, and a new trial ordered.

*Pennel Cherrington* for appellant.

*W. H. King* and *W. S. Marks* for respondent.

FRICK, C. J.

Respondent recovered judgment for damages against appellant in an action for negligence. The alleged damages were caused in a collision of respondent's team while hitched to a wagon with one of appellant's fast passenger trains at a public country crossing in Tooele County, Utah. The only question presented for review on this appeal is an alleged error committed by the trial court in refusing to charge the jury as requested by appellant that respondent in attempting to cross the track at the time in question was guilty of negligence which caused or directly contributed to the injuries and damages complained of, and for that reason the jury should find in favor of the appellant.

Respondent's negligence, appellant's counsel contends, is established by uncontroverted evidence, and hence should be declared as a matter of law. The evidence upon the question of negligence most favorable to respondent is substantially as follows: On the 28th day of January, 1908, a short time before noon, respondent was driving his team, hitched to a farm wagon, on a public highway in Tooele County. The highway in question, before crossing the railroad track, runs parallel with the track for about a quarter of a mile, and then turns at a right angle across the track. Easterly from the point where the highway turns and continues parallel with the track both the highway and the track run in a southwestly and northeasterly direction, and the track is laid in a cut about ten feet in depth, which extends about one hundred rods southwesterly from the crossing, and also

for perhaps more than that distance northeasterly therefrom. The depth of this cut is considerably increased at places by the waste matter taken from the cut and thrown out on the embankment. In traveling on the highway in its course parallel with the track there are places where, if one looked, a train coming from the west could be seen. On the morning in question respondent says it was "smoky and foggy," and at the point where he turned to follow the highway parallel with the track he could see the country to the southwest along the track for "about half a mile." He further says, "I wasn't specially looking for a train," but that he neither saw nor heard one. While traveling northeasterly parallel with the track, he says he did not look for a train. When he arrived at the point where he was about to turn to cross the track, he says: "I drew up my horses as I made that turn. I was on a sort of a jog trot coming along the parallel highway, and, as I made the turn, naturally drew up my horses and slowed down and listened. There was no sound I could hear—no sound of a train." The point at which he "slowed up," he says, was about fifty feet from the track, and that while driving toward the crossing he glanced to the west, and then looked "northeasterly down the track." He further says that he continued to look in a northeasterly direction for a train until "my team was just about to the track." Then he looked southwest again, and then saw the train which struck his team and wagon. At this moment, he says: "My team was on the track." Seeing the train so close upon him startled him, and he does not remember of doing anything more. His team and wagon were struck and damaged, and he received some personal injuries. On cross-examination he, in substance, said that he was quite familiar with the crossing in question; that he crossed it about once a week; that he knew that the train which struck his team was a fast passenger train, but did not know the time it would pass that point. In driving easterly parallel with the track, he did not look back for a train. Did not stop his team at any point to listen for the approach of a train, but slowed down to a walk. Did not

stop to listen for a train from the west, because "I din't think it necessary." Knew a train could not be seen more than one hundred and fifty feet west of the crossing from a given point, and knew that a train might come along at any time. Could not see a train coming from the east, either, until it had reached a point one hundred and fifty feet east from the crossing. Did not stop to look for a train from the west, because "I was curious to see a train from the other way." Had no curiosity about a train which might come from the west. Expected a train from the east about that time, but did not expect one from the west. "Q. And, after you left the corner of the fence fifty feet from the track, you did not look again until your team was right on the track; then you turned around and the engine was on you; that's correct, is it? A. Yes." He knew that the train from the west came downgrade before reaching the crossing. "Q. . . . Did you testify on direct examination that the first time you loked to the west was just at the turn of the highway around the right of way fence and about fifty feet from the track? A. Yes, sir. Q. Did you say that from that time on for a distance of ten or twelve feet you kept your eyes to the west? A. Yes." Respondent also made a statement with respect to the accident two days after it occurred, which he signed, and in which, among other things, he said: "Between the road and track inside the fence is a high bank. On this particular morning it was foggy and smoky, and I did not look back while driving along to see if train was coming for that reason. I was looking down the track toward Erda, for I knew a freight train was due about that time. I wasn't thinking or know of the approach of the limited train. I did not hear any signal from engine nor the rumbling of the train. I was trotting along, and didn't stop as I approached the crossing to look or listen if train was coming. My horses saw the train and shied, and this caused me to look around, and then it was I saw the train, but it was too late. Had I stopped my wagon at corner of fence where road turns to cross the track, I could have seen the train coming, but it was downhill and hard to stop un-

less you had a brake." He explained some of the expressions used in the forgoing quotation on his redirect examination, and on such examination he was asked the following questions with respect to looking or listening for a train from the west which he answered as indicated: "Q. Did you observe—how long did you look, in seconds? A. Which, direction? Q. To the west at the point where you turned and slowed down to a walk. A. Oh, perhaps three seconds or four. Q. And state the extent to which you listened. . . . Describe to what extent you did listen. A. I directed my attention that way (west) looking that way and immediately turned and looked the other way (east). I (was) satisfied in my mind, not having seen any train. Q. Did you reach any conclusion it was safe for you to proceed in the direction of the track? A. Yes, sir." There was also evidence that for some distance west of the crossing the track is downgrade amounting to nearly one per cent, as it proceeds easterly; that the trains in approaching the crossing from the west require no steam to propel them, and in consequence make but little, if any, noise, and emit little, if any, smoke or steam from the smokestack; that the train in question was running at the rate of about forty miles an hour; that neither the respondent nor two or three others who were in the vicinity and could have heard the signals heard any signal or sound of warning given as the train approached the crossing, nor at any point westerly thereof. A witness called on behalf of respondent also testified that at a point forty feet south of the crossing a train could be seen for about five hundred feet as it approached the crossing from the west. The highway is considerably higher than the track, so that in approaching the crossing the ground slopes towards the track. Respondent also admitted that at the time of the collision he may have worn a cap turned down over his ears.

The foregoing, in substance, constitutes the evidence most favorable to respondent upon the question of his own negligence. At first blush, we were impressed with the idea that, in view of all the circumstances, the question of respondent's negligence was for the jury. Upon a careful consideration

of all the evidence, however, and upon mature reflection, we have been forced to the conclusion that respondent's injuries were caused by reason of his own carelessness in attempting to cross the railriod track without looking or listening for a train approaching from the west. It is manifest that if respondent had looked to the west, even for a moment, at any time when he was anywhere from forty to ten feet south of the track, he must have discovered the approaching train from the west, and thus could have stopped his team in time to have avoided the collision. In view of this, his own want of care was the proximate cause of the collision and the consequent injury. Judge Elliott in his excellent work on Railroads, in vol. 3 (2d Ed.), section 166, states the duty of the traveler in attempting to cross a railroad track as follows:

"The general rule is that it is not sufficient to look in one direction, but the traveler is under a duty to look in both directions. The duty to look and listen requires the traveler to exercise care to select a position from which an effective observation can be made. The mere fact of looking and listening is not always a performance of the duty incumbent upon the traveler, for he must also exercise care to make the act of looking and listening reasonably effective, and must usually continue to be on the lookout and exercise his faculties until he has crossed. . . . He must look and listen for all trains, and not merely for some train, for he has no right to proceed upon the assumption that trains will cross only at specified times. He has, indeed, no right in any case to omit to take precautions for his own safety upon the supposition or assumption that he may safely cross the track."

While ordinarily the question whether under all the circumstances of a particular case the traveler has exercised the degree of care which the law imposes on him in attempting to cross a railroad track is for the jury, yet where the facts are not in dispute, and where reasonable men cannot differ upon the proposition that, if the traveler had looked or listened, he must have discovered the approaching train in time to have avoided the collision, the question of his negligence is one of law, and not of fact. (*Wilkinson v. O. S. L. R. Co.*, 35 Utah, 110, 99 Pac. 466.)

We think that in this case the unqualified statements of respondent show that, if he had made an effort to discover the train approaching from the west, he could have avoided the collision. Where, under all the circumstances, it is beyond dispute that, if a traveler had exercised ordinary care for his own safety, the accident would not have happened, and thus the presumption of due care on his part has been overcome, but one result is permissible. It is true that there may be conditions and circumstances under which a traveler may be excused for not looking or listening, but, where the facts and circumstances are such that all reasonable men must arrive at the same conclusion, then there is nothing to pass upon by the jury. If, however, reasonable men may arrive at different conclusions, or if the evidence is in conflict, or in case different inferences may be deduced from certain facts, then the question of the traveler's negligence is one of fact. In this case the undisputed facts admit of no reasonable doubt that the accident was caused by respondent's own negligence. We are of the opinion that the court erred in refusing to charge the jury to return a verdict in favor of appellant as requested by its counsel.

The judgment is reversed and the cause remanded to the district court, with directions to grant a new trial. Appellant to recover costs.

McCARTY and STRAUP, JJ., concur.