## SHORTINO v. SALT LAKE & U. R. CO.

No. 3182.   Decided July 10, 1918.   On Application for Rehearing
Aug. 20, 1918.   (174 Pac. 860.)

1. TRIAL—VIEW BY JURY—DISCRETION.  The court did not under Comp.
   Laws 1907, section 3152, abuse its discretion in refusing to permit
   the jury to view place of accident, where any one could, by atten-
   tively reading the evidence and examining the photographs in evi-
   dence, understand the situation as well as though he made a per-
   sonal view.  (Page 488.)

2. RAILROADS—FRANCHISE ORDINANCE—POWER TO IMPOSE CONDITION—
   SPEED OF TRAINS.  A franchise ordinance limiting the speed of de-
   fendant's cars on its interurban road to 12 miles an hour within
   the town is valid and within the power of the town, though Const.
   art. 12, section 8, does not apply to interurban railroads.  (Page
   488.)

3. RAILROADS—CROSSING ACCIDENT—VIOLATION OF SPEED ORDINANCE.
   The violation by defendant, owner of interurban line running
   through a town, of a franchise ordinance limiting speed to twelve
   miles an hour, constitutes negligence, and a private person may
   charge defendant with negligence in case of violation where he is
   injured at a crossing, the same as where speed is limited by any
   other ordinance.[1]   (Page 489.)

4. RAILROADS—GIVING SIGNALS ON APPROACHING HIGHWAY—STATUTE.
   Comp. Laws 1907, section 447, as to giving signals on approaching
   highways and street crossings, applies to railroads, whether operated
   by steam or electric power, in view of Laws 1907, c. 93, section 4
   (now Comp. Laws 1907, section 434x), amending section 447, by
   providing, among other things, that railroads may be operated by
   steam, electric, or other power.  (Page 490.)

5. EVIDENCE—COMMON KNOWLEDGE—OPERATION OF TRAINS.  It is a
   matter of common knowledge that a train of cars, especially pas-
   senger cars, is propelled as swiftly by means of motor cars as are
   trains that are propelled by steam locomotive engines, and that the
   danger to ordinary travelers at public or private crossings, in either
   case, is precisely the same.  (Page 491.)

6. APPEAL AND ERROR—INSTRUCTIONS—GENERAL EXCEPTIONS.  A gen-
   eral exception to a whole paragraph of an instruction presents

---

[1]Smith v. Mine & S. S. Co., 32 Utah, 21, 88 Pac. 683; Rogers v. Rail-
way Co., 32 Utah, 367, 90 Pac. 1075, 125 Am. St. Rep. 876; Jensen v.
Utah L. & Ry. Co., 42 Utah, 415, 132 Pac. 8.

Appeal from Third District.

nothing for review unless the whole paragraph is vulnerable. (Page 493.)

7. TRIAL—INSTRUCTIONS COVERED BY CHARGE—REFUSAL. Requested *instructions sufficiently covered by court's charge are properly refused.* (Page 493.)

8. RAILROADS—CROSSING ACCIDENT—CONTRIBUTORY NEGLIGENCE—EVIDENCE. *In action for injuries due to collision of plaintiff's automobile with defendant's interurban train at crossing, held plaintiff was guilty of contributory negligence as a matter of law so that court erred in refusing to instruct verdict for defendant.* (Page 494.)

9. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—QUESTIONS OF LAW AND FACT. *If there is any substantial doubt whether a plaintiff was guilty of contributory negligence, or whether such negligence was the proximate cause of the injury, the court cannot determine the right to recover as a matter of law.* (Page 494.)

10. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—QUESTIONS OF LAW AND FACT. *Where the facts are conceded, or there is no conflict in the evidence, and but one conclusion is permissible, the questions of contributory negligence and proximate cause are questions of law, and must be determined by the court.* (Page 494.)

11. RAILROADS—CROSSING ACCIDENT—CONTRIBUTORY NEGLIGENCE. *If a traveler in attempting to cross a railroad track at a public crossing has not complied with the duty which the law imposes upon travelers, to look and listen, and under some circumstances stop, and his failure is the proximate cause of the injury, the law prevents recovery.*[2] (Page 495.)

12. NEGLIGENCE—PRESUMPTION AS TO DUE CARE. *Where the accident is observed from various points, no presumption, arising from the instincts of self-preservation, can be indulged.*[3] (Page 495.)

13. NEGLIGENCE—CONCURRING NEGLIGENCE—PROXIMATE CAUSE. *Where both parties are equally negligent, the only question is whose negligence was the proximate cause of the accident.* (Page 501.)

14. RAILROADS—CROSSING ACCIDENT—CONTRIBUTORY NEGLIGENCE—EVIDENCE. *In action for injuries due to collision of plaintiff's automobile with defendant's interurban train at crossing, held, under the evidence, that plaintiff's negligence was the proximate cause of the accident.* (Page 501.)

---

[2]*Wilkinson* v. *Railroad,* 35 Utah, 110, 99 Pac. 446; *Bates* v. *Railroad,* 38 Utah, 568 114 Pac. 527.

[3]*Farnon* v. *Silver King, etc., Co.,* 50 Utah, 295, 167 Pac. 675.

On Application for Rehearing.

15. RAILROADS—CROSSING ACCIDENT—CONCURRING NEGLIGENCE. The
law imposes the same duty on plaintiff, whose automobile collided
with defendant's interurban train at crossing, as upon defendant,
and, since neither discharged the duty imposed by law, the law
affords no relief. (Page 504.)

16. RAILROADS—CROSSING ACCIDENT—LAST CLEAR CHANCE DOCTRINE.
In action for injury due to collision of plaintiff's automobile with
defendant's interurban train at a crossing, facts and circumstances
*held* not to entitle plaintiff to the benefit of the last clear chance
doctrine. (Page 505.)

Appeal from the District Court of Salt Lake County, Third
District; *Hon. Wm. H. Bramel,* Judge.

Action by Samuel Shortino against the Salt Lake & Utah
Railroad Company.

Judgment for plaintiff. Defendant appeals.

REVERSED and remanded, with directions.

*Moore, Mitchell and Maginnis* for appellant.

*Marioneaux, Straup, Stott and Beck* for respondent.

FRICK, C. J.

The plaintiff recovered judgment against the defendant
for damages for personal injuries and the destruction of an
automobile caused by the alleged negligence of the defend-
ant. The defendant appeals from the judgment.

The plaintiff in his complaint, in substance, alleged that the
defendant owned and operated a railroad between Salt Lake
City and the town of Payson, in the state of Utah, over which
it transported freight and passengers by means of cars pro-
pelled by electric motors; that the town of Salem is on said
line of railroad, at which town the defendant maintained a
depot or station building, near which there is a public high-

way known as the State road which was crossed by said railroad; that on the 30th day of July, 1916, in the "night-time" of said day, while plaintiff was driving his automobile over said crossing, one of defendant's trains of cars collided with plaintiff's automobile and seriously injured him, describing the injuries in detail. The acts of negligence that are alleged in the complaint, in substance, are: (1) That the "motorcar" was not equipped with a proper and sufficient headlight; (2) that the defendant, in approaching the crossing in question, negligently failed "to give timely warning signals"; (3) that defendant did not have said train under reasonable control, and failed to keep a reasonable and proper lookout in approaching said crossing; (4) that in approaching, and in crossing over, said crossing defendant operated said train at an excessive and dangerous rate of speed; and (5) that defendant had negligently failed and omitted to place and maintain suitable "cross-arms" or sign-boards, or some other similar device, to warn persons on such highway of the existence of said railroad crossing.

The following sketch or plat will assist the reader to a better understanding of the evidence.

The defendant denied all acts of negligence, and, as an affirmative defense, averred that, if the plaintiff was injured and damaged as alleged, such injuries and damages were

caused by and through his own acts of negligence, which acts are set forth in the answer.

The controlling facts, as they are made to appear from plaintiff's evidence, are, substantially, as follows:

On the 30th day of July, 1916, the defendant owned and operated an interurban line of railroad between Salt Lake City, Salt Lake County, and the town of Payson in Utah County, this state. The railroad was operated for the transportation of freight and passengers by means of electricity. The cars were operated by what are called motorcars, and the power was transmitted to and through the motors by means of a trolley wire attached to cross-arms, which were fastened to what are called trolley poles, placed along the track a few feet distant therefrom and about 150 feet apart. The train in question consisted of two cars, one motorcar and a car called a trailer. It was shown that defendant's railroad passes through the town of Salem, which is about three miles north from the town of Payson, which, at the time in question, was the southern terminus of the road; that on the 30th day of July, 1916, plaintiff owned a five-passenger Oakland automobile, and that about noon of that day he, with some of his friends, passed through the town of Salem over the crossing in question; that on the evening of that day, at about eight twenty o'clock, the plaintiff, with six others, again passed through the town of Salem with the automobile in question—that is, there were seven passengers, including the plaintiff, in the automobile.

Referring now to the plat: The evidence shows that plaintiff was driving westward on the state road, the traveled portion of which is indicated by the shaded strip on the plat. In coming into the town of Salem, and about four to six hundred feet east from where the railroad (marked "R. R." on the plat) crosses the state road, which is the crossing in question, plaintiff passed one Edward L. Peery, who was then marshal of the town of Payson. Peery, at the time, with three companions, was on the side of the road with an automobile. Peery says he knew the plaintiff, and that when he passed the point where Peery and his companions were he, in

Peery's judgment, was driving at a speed of from ten to fifteen miles an hour. At about the time plaintiff passed the point where Peery was, or immediately thereafter, Peery says he heard the whistle of defendant's train as it was coming into or passing through the town of Salem. Peery also says he could see the place where the railroad crossed the state road, and he saw another automobile approaching the crossing in question from the west; that is, coming towards plaintiff's automobile. Peery also says he heard the train whistle again, and shortly thereafter heard the gong and bell sounded, and also heard short or sharp toots or blasts of the whistle, and saw the train pass from behind the stable or barn which is indicated by the shaded square on the plat marked "S." Peery, however, heard the gong sounded and the short, sharp toots of the whistle immediately before the collision.

There were also quite a number of eyewitnesses who saw the collision between plaintiff's automobile and the train of the defendant. A Mr. Grant, an eyewitness to the accident, testified for the plaintiff. It seems he made various observations and measurements immediately or soon after the collision occurred. Mr. Grant lived in a house which was a little less than one block east of the crossing where the collision occurred. He saw plaintiff's automobile and its occupants pass his house and he heard the latter talk and laugh, as he puts it, and noted and understood some of their remarks. Mr. Grant says that in his judgment plaintiff at the time was driving at the rate of about ten miles an hour, or perhaps a little less. He was inclined to make it less rather than more. Mr. Grant said that just before or at about the time plaintiff's automobile ran west past Mr. Grant's home he heard the whistle of defendant's train. He heard it whistle again, and then also heard the gong sounded and the short, sharp blasts or toots of the whistle referred to by Mr. Peery, and immediately thereafter the collision occurred. According to the measurements of Mr. Grant, defendant's depot is 285 feet from the center of the crossing,

and the front end of the train stopped after the collision at the depot, according to Grant's statements.

There were quite a number of persons waiting at the depot for the incoming train. Several of those persons testified, and the substance of their evidence is to the effect that they heard the whistle of defendant's train, and shortly thereafter noticed plaintiff's automobile with its occupants approaching the crossing from the east. The depot is situated in the direction of the arrow shown on the plat, and, as stated by Mr. Grant, is 285 feet from the crossing. The witnesses who testified were outside of the depot building, and, as stated, heard the whistle of defendant's train as it approached the crossing. Some agreed with Mr. Grant and Mr. Peery that the train whistled twice, while others said they only heard the train whistle once before they heard the sounding of the gong and the short, sharp blasts of the whistle. All of the witnesses, however, plainly heard the train whistle as it was coming into or passing through the town of Salem and approaching the crossing in question. The witnesses, however, said that the train was required to cross several other streets in the town of Salem before reaching the crossing in question.

In passing along the road plaintiff passed Mr. Grant's house, which, as before stated, is not quite a block east of the crossing. He also passed the home of Mr. Curtis, which is west of Mr. Grant's house and somewhat nearer the crossing. He also was required to pass an old barn or stable represented by the shaded square marked "S" on the plat. This barn, Mr. Grant testified, was thirty-five feet distant from the railroad track. Mr. Grant also testified that, according to his observations and measurements, plaintiff could have seen defendant's train approaching the crossing from the south at a point ninety feet east from the track, at the point marked "90" on the plat. Other witnesses made it less, but they merely guessed at the distance, and none of plaintiff's witnesses disputed Mr. Grant's measurements or statements. Just how far south of the crossing the train could first be seen by one driving west after passing the stable is not made very clear by plaintiff's evidence, but from all

the evidence on that question it is reasonably clear that the distance is not less than 280 or 300 feet and maybe more than that. There is evidence in the record that the train could be seen further than that.

Plaintiff's witnesses practically all agree that plaintiff was driving at a speed of from seven to ten miles an hour. One of the young ladies in the automobile said that she noticed the speedometer just before the collision occurred and that it was fluctuating between seven and ten miles. The witnesses also all agree that the train, as it approached the crossing, was running at from thirty to thirty-five miles an hour, but none of the witnesses was in a good position to judge accurately of the speed, in view that the train was coming toward them.

Some of the witnesses also said that as the plaintiff was driving westward toward the crossing another automobile passed him on the north going west, and passed over the crossing ahead of the approaching train. It is also true that others of plaintiff's witnesses said they did not see or notice that automobile, but the affirmative evidence is clearly to the effect that another automobile passed over the crossing ahead of him.

Plaintiff's witnesses also testified that there was an automobile coming from the west toward the plaintiff as he approached the crossing, and some of them say they first saw it at about the point marked ''B'' and that it stopped at about the point marked '' C'' on the plat, and just before defendant's train passed over the crossing.

Plaintiff's witnesses who stood at or near the depot also saw the headlight of defendant's motorcar as it approached the crossing. They all said that there is a curve in the defendant's track south of the crossing which caused the rays of the headlight to be turned to the east or towards the barn. The witnesses also saw the plaintiff and the occupants of the automobile and heard them talk and laugh as the automobile approached the crossing. They also saw that the plaintiff drove his car right up to the track, at which point the automobile appeared to stop at about the time when it was struck

by the oncoming train at the point marked "X" on the plat, and was whirled around and thrown to the point marked "A" on the plat, a distance of twenty-five or thirty-five feet, while plaintiff was thrown out of the car and was thrown still farther to the north.

Two of the young men who were occupants in plaintiff's automobile, and who were sitting on the knees of those sitting in the rear seat, saw the approaching train after it passed the stable, and they jumped out of the automobile and were not injured, while plaintiff and the others remained in the car, and plaintiff was thrown therefrom and seriously injured, as before stated. The automobile was apparently struck by the right-hand corner of the motorcar and about the front wheels and the engine.

Three of the occupants who were in the automobile with the plaintiff testified that they did not hear the train whistle, and did not hear any signals, and did not know of its approach, until the two young men jumped from the automobile and just before it was struck by the motorcar, as aforesaid. Plaintiff, as a part of his evidence, also produced a number of photographs which, all his witnesses testified, correctly reflected and represented the objects and situation at and near the crossing in question at the time of the accident.

Some of plaintiff's witnesses also testified that at the time of the accident the road was dry and dusty, and that the automobile that passed the plaintiff, as before stated, caused considerable dust to rise from the road. It was also shown that the accident occurred at about eight twenty in the evening mountain time. All of the witnesses said that it was "between sundown and dark." Some of them, however, said it was nearer dark than sundown, while others said that it was nearer sundown than dark. At all events, all said it was still light enough to see, and it seems none had any difficulty in seeing what he said transpired at the time.

It was also shown that the rails of the crossing were flush with the grade of the road, but that the rails could plainly be seen at either side of the traveled roadway; that the road in question was six rods wide; that defendant had not placed

any sign or "cross-arms," nor any other similar warning device, at the crossing in question; that there was a line of trolley poles, with cross-arms and wire, along the track and a few feet distant therefrom, and that there were also electric light and telephone poles, with wires thereon, along the track; that the trolley poles were about fourteen inches in diameter at or near the earth, and tapered to about seven or eight inches at the top; that those poles, to some extent, obscured the view of the track in looking southward in passing west of the barn or stable shown on the plat. The dotted line on the plat merely indicates the point where one in passing westward along the traveled portion of the road could first see a train approaching from the south and the point where the plaintiff could have seen the approaching train on the evening in question.

It also appeared from the evidence that there were some trees on both sides of the track, and some smaller trees and some outhouses near the Grant and Curtis homes, which, to some extent if not entirely, obstructed the view in the direction from which the train was approaching. In view of all the evidence, including the photographs produced by the plaintiff as before stated, it is, however, clear that the crossing in question was open and as free from obstructions to the view as a crossing in a town or populated district well could be. The greatest obstruction near the track was the old barn or stable shown on the plat. There was also a row of posts, about four feet high and a short distance apart, set in the ground along the north margin of the street on which plaintiff was driving his automobile, which were painted yellow, with a darker color at the top, which were placed there and used as a means to fence in the depot grounds. Those posts were quite conspicuous.

Plaintiff also proved by competent experts the extent and character of his injuries, which were very severe. The only injuries material here, however, are those to plaintiff's skull, which was fractured at the base of the brain. The doctor in attendance testified that the plaintiff was unconscious for several days after the injury, and that he suffered from

severe shock. The experts also testified that the injuries suffered by the plaintiff were so severe that they might have caused concussion of the brain, and that the injuries to the skull were of such a character as might cause the plaintiff to lose his memory of events and occurrences immediately preceding, and perhaps for a considerable time before, the accident.

The plaintiff also testified in his own behalf. He said that he remembered passing Mr. Peery by the side of the road as he was driving into the town of Salem; that he had passed through the town over the road and crossing in question about noon, or a little before noon, of the day of the accident. In answer to questions put to him by his counsel how often he had traveled over the road in question he said that he had been "over that road a few times—I don't know how many times, but a few times." The other occupants of the automobile who testified corroborated plaintiff in the statement that they had passed over the road in question before on that day. Plaintiff further testified that after he was in the town of Salem, and after he had passed Mr. Peery, another automobile passed him and went ahead of him; that the automobile that passed him was running at a high rate of speed and caused considerable dust to rise from the roadway; that he saw another automobile ahead of him approaching him; that he noticed its headlight; that, while he knew he was in the town of Salem, he did not know that he was approaching the crossing in question, or any railroad crossing; that he did not hear any signals or warning and did not see the train or its headlight; and that no cross-arms or other signs were up at the crossing. He also testified that he did not remember whether he looked or listened on this particular occasion, but that he was a careful driver, and that he had had considerable experience in driving automobiles in this and other states, and generally looked and listened. The last thing he remembered, he says, was seeing the automobile approaching him from the east. He said he was traveling not exceeding 10 miles an hour, and he thought less, and could have stopped

his automobile at least within 20 feet, and he thought within its own length, which was about twelve feet.

Mr. Grant and some others of plaintiff's witnesses also testified that the motorcar ran a distance of 285 feet before it was stopped after it struck the automobile.

Plaintiff was also permitted to introduce in evidence, over defendant's objections and exceptions, a certain ordinance passed by the authorities of the town of Salem in which defendant was granted the right to pass through the town and cross the streets. In said ordinance it, among other things, was provided that the cars of the defendant "within the settled portion of said town" should be operated at a rate of speed "not exceeding twelve miles per hour." The plaintiff also proved the written acceptance of the ordinance aforesaid by the defendant.

After producing substantially the foregoing evidence the plaintiff rested, and the defendant moved for a nonsuit upon the grounds (1) that the plaintiff had failed to establish any negligence on the part of the defendant, and (2) that under the evidence produced by plaintiff it appeared that the accident was caused by reason of his own negligence as a matter of law. The court denied the motion.

The defendant then produced its evidence, but, in view that the case must be determined upon plaintiff's evidence, we shall not pause here to refer to defendant's evidence, except to say that in some particulars its evidence was not disputed. For example, the defendant made some accurate measurements regarding distances which were not disputed; but in view that plaintiff's evidence, except on a few unimportant matters, did not really differ from defendant's measurements, we shall not refer to those measurements.

After the defendant had produced its evidence, it made a motion asking the court to direct the jury to proceed to view the locus of the accident, which motion was denied. It then requested the court to direct the jury to return a verdict for the defendant, which request was also denied, and the court submitted the case to the jury.

A number of errors are assigned and are argued in counsel's brief, and were argued at the hearing. We shall now proceed to consider the assignments which we deem material.

The first assignment to be noticed is that the court erred in refusing to permit the jury to view the place of the accident. Under our statute (Comp. Laws 1907, section 3152) the matter of permitting the jury to view a place, etc., is largely a matter of discretion. In view of the photographs and the other evidence, including a large number of eyewitnesses, we cannot see how either party could have either gained or lost anything by having the jury view the crossing in question. Neither the jury nor any one else who will attentively read the evidence and examine the photographs can fail to understand the situation just as well as though he had a personal view of it. We are clearly of the opinion that the court did not abuse its discretion in refusing to permit the jury to view the crossing, and hence this assignment must be overruled.

Counsel for defendant next contend that the court erred in receiving the franchise ordinance in evidence in which the speed of defendant's cars was limited to twelve miles an hour. It is contended that the town of Salem did not possess the legal power or right to impose such a condition, and hence that part of the ordinance is of no force or effect. In that contention we think counsel are in error.

In article 12, section 8, of our Constitution, it is provided:

"No law shall be passed granting the right to construct and operate a street railroad, telegraph, telephone or electric light plant within any city or incorporated town, without the consent of the local authorities who have control of the street or highway proposed to be occupied for such purposes."

If it were held, however, that the foregoing provision did not apply to defendant's interurban railroad, yet the authorities of the town of Salem clearly had the right to grant or withhold the right to the use of the streets in the town, and thus to impose conditions respecting the use thereof for pur-

poses other than the right of ordinary travel thereon. To limit the speed at which cars or trains should be operated in the streets certainly is a most reasonable and salutary regulation.

The only questions, therefore, are (1) whether the violation of such a condition in a franchise ordinance constitutes negligence; and (2) whether a private person may charge the company with negligence in case the condition is violated and he is injured. If the ordinance had been passed by the authorities of the town of Salem for the express purpose of regulating the speed of trains, and such ordinance had imposed a penalty in case of its violation, counsel concede that such violation would constitute negligence per se under the decisions of this court. See *Smith v. Mine & S. S. Co.*, 32 Utah, 21, 88 Pac. 683; *Rogers v. Railway Co.*, 32 Utah, 367, 90 Pac. 1075, 125 Am. St. Rep. 876; *Jensen v. Utah L. & Ry. Co.*, 42 Utah, 415, 132 Pac. 8. In what way does a franchise ordinance in which the speed of trains is limited differ from any other ordinance providing for the same thing? We confess our inability to perceive any difference. The precise question was before the Supreme Court of Missouri in the case of *Chouquette v. Southern El. Ry. Co.*, 152 Mo. 257, 53 S. W. 896, and was also before the Court of Appeals of Indiana in *Cincinnati, etc., Ry. Co. v. Stahle*, 37 Ind. App. 539, 76 N. E. 551, 77 N. E. 363, where it was held that such a provision in a franchise ordinance is valid, and that a violation thereof constitutes negligence as against a private person who may be injured by reason of excessive speed, which, it is held, constitutes negligence on the part of the company. See, also, 4 McQuillin, Mun. Corp., section 1644, where a number of cases are cited.

Assuming, without deciding, that the constitutional provision aforesaid has no application, yet defendant's contention cannot prevail. No one will, or can successfully, contend that the provision in the franchise ordinance limiting the speed of trains "within the settled portion of said town to not exceeding twelve miles per hour" is either unlawful or unreasonable. Moreover, defendant's counsel concede that

the town authorities of Salem could have passed and en-
forced such an ordinance. That being conceded, it follows
they had the right to impose the condition in the franchise
ordinance, and, the defendant having accepted the franchise
upon those conditions, it is bound thereby. 4 McQuillin,
Mun. Corp., section 1688, and cases cited. This contention
must therefore also fail.

It is next urged that the district court erred in charging
the jury with regard to the duty the statute imposes
upon railroad companies in giving signals in approach-          4
ing highway and street crossings. The charge in ques-
tion was based on Comp. Laws 1907, section 447, which,
among other things, provides:

"Every locomotive shall be provided with a bell weighing
not less than twenty pounds, which shall be rung continu-
ously from a point not less than eighty rods from any street,
road, or highway crossing, until such street, road, or high-
way shall be crossed, but the sounding of the locomotive whis-
tle at least one-fourth of a mile before reaching any such
crossing shall be deemed equivalent to ringing the bell as
aforesaid, except in towns and at terminal points; during the
prevalence of fogs, snow, and dust storms, the locomotive
whistle shall be sounded before each street crossing while
passing through cities and towns."

The court charged the jury that the provisions just quoted
applied to defendant's motorcars the same as to any locomo-
tive propelled by steam. Counsel for defendant insist that
the charge is erroneous in that a motorcar does not come with-
in the purview of the foregoing statute. If there. were
nothing else in the statute save what we have quoted, there
might be much force to counsel's position. Long after the
foregoing statute was passed, however, and under which all
railroads in this state are incorporated and operate, it was
amended. Laws Utah 1907, p. 106. In the amendment it is
provided that railroads may be operated "by steam, electric,
animal, or other power, or any combination thereof." It is
further provided in said amendment (which amendment now
constitutes section 434x of Comp. Laws 1907) as follows:

"Railroad corporations heretofore organized and now existing, or hereafter organized and existing, under the laws of this state shall be subject to all the duties imposed, and shall have and possess all the powers and privileges conferred by this chapter, as well as the powers and privileges conferred by the laws under which said corporations were organized, or which are contained in their articles of incorporation, and are not inconsistent with the laws and Constitution of this state."

It will thus be seen that railroad companies may adopt and use any power or method which by them is deemed most convenient to propel their cars or trains. Whatever the power or means that is adopted and used for that purpose, nevertheless, makes the company subject to all the duties that are imposed by the statute.

It is a matter of common knowledge that a train of cars, especially passenger cars, is propelled quite as swiftly by means of motors or motorcars as are trains that are propelled by steam locomotive engines, and that the danger to ordinary travelers, at public or private crossings, is precisely the same whether the train is propelled by one or the other of the foregoing methods. It is therefore quite as essential that a train propelled by electricity should give warning signals of its approach as it is that a train propelled by a steam locomotive should do so. This is precisely what the statute requires. Of course, no one would contend that a motorcar must have a bell of precisely the same pattern that is used by a steam locomotive, or that it must be rung in the same way or by the same means. Nor is a motorcar required to be provided with a whistle operated by steam. One that is operated by compressed air, or by electricity, or by other means, if it produces the effect intended by the statute, is sufficient. That is likewise true of the bell required by the statute. Such, as we read it, is the effect of the instruction complained of. This question was before the Supreme Court of Kentucky in *Commonwealth v. Louisville El. Ry. Co.*, 141 Ky. 583, 133 S. W. 230, where, under a statute similar to ours, it was held that the provision found

in section 447, supra, applied to trains propelled by electric motorcars. The Supreme Court of Arkansas arrived at practically the same conclusion in the case of *Chicago, etc., Co. v. Bryant*, 110 Ark. 444, 162 S. W. 51, although the question was not directly before the court in that case. We are of the opinion, therefore, that the court did not err in giving the instruction complained of, and hence this assignment cannot be sustained.

It is further insisted that the court erred in submitting to the jury the question of the necessity of putting up and maintaining cross-arms, or some other suitable sign or device, to apprise travelers of the railroad crossing, and whether the failure to place and maintain such cross-arms or other similar device constituted negligence. While defendant's counsel do not seriously contend that it was improper to submit that question, yet they contend that the court erred in repeating defendant's failure in that regard, and in thus making that question too prominent to the jury. It is true that the court had in a certain instruction referred to the subject, and also in two other instructions again specifically called attention to the matter, and in that way the court did charge upon the subject at least twice. We are unable to perceive, however, how the defendant was prejudiced by anything that the instructions contained on that subject. It is, however, only just to state in this connection that the charge as a whole contained frequent repetitions. The charge contained considerably over 6,000 words. While it is true that a number of legal propositions are involved, yet the principal questions related solely to the negligence of the defendant in operating its train in approaching the crossing, and to the alleged contributory negligence of the plaintiff in driving his automobile in attempting to cross the track. Apart from the usual stock instructions, the charge is divided into thirty-five distinct paragraphs, many of which are quite long, and practically every one of the paragraphs contains more than one legal proposition.

Counsel for defendant excepted to twenty of the thirty-five paragraphs. The exception invariably reads as follows: "De-

fendant excepts to instruction No. —,'' stating the number of the paragraph excepted to. We have repeatedly held—indeed, we have so often decided it that it has become elementary—that unless the entire paragraph is vulnerable such an exception presents nothing for review. As before stated, each paragraph of the court's charge, with perhaps one or two exceptions, contained more than one legal proposition. A general exception to the whole paragraph, therefore, may refer to any one of several propositions contained in the paragraph. The purpose of taking an exception to an instruction is to direct the trial court's attention to the legal proposition which it is contended is faulty. The fault may lie in an omission, or in a word, a phrase, or sentence, or in several sentences. While no reason need be assigned for the exception, yet if an alleged faulty statement of law consists in a word, phrase, or sentence, or in a series of sentences, the exception should be limited to such word, phrase, sentence, or sentences, so that the trial court may examine them, and, if possible, correct the error. If, therefore, an exception is to the whole paragraph, it is a matter of mere conjecture what portion of the same is intended to be excepted to. Nor does such a general exception present anything to this court for review unless the whole paragraph excepted to is faulty, which is seldom the case. In view, therefore, of the general nature of the exceptions, we cannot review the many errors assigned relating to the instructions.

It is, however, also insisted that the court erred in refusing to give at least seven of defendant's requests. At least six of those requests are, however, vulnerable to the same objection that defendant's counsel have argued against a number of instructions that the court gave, namely, that they are mere repetitions. The subjects contained in the six requests just referred to were sufficiently covered by the court's charge, and hence defendant was not prejudiced by the refusal of the court to give those requests.

A number of assignments relate to the admission and exclusion of evidence. Nothing could be gained by referring

to those assignments separately and in pointing out specifically why no prejudice resulted from the court's rulings. It must suffice to say that the court permitted each party to fully develop his theory of the case, and permitted each party to present all the evidence pertinent to such theory.

This disposes of all the assignments that are material except the one which relates to plaintiff's contributory negligence. As before stated, defendant, at the close of the evidence, requested the court to instruct the jury to return a verdict in favor of the defendant, which request the court refused, and defendant's counsel insist that the court erred in refusing the request for the reason that the plaintiff was guilty of contributory negligence as a matter of law and the court should have so ruled. In view of what has already been said, it is not necessary to discuss the question of defendant's negligence.

While, as just stated, defendant's counsel contend that plaintiff was guilty of contributory negligence as matter of law, counsel for plaintiff insist that the question was one of fact for the jury, and, in view that they have found against the defendant, we are bound by the finding.

That the question of contributory negligence on the part of the plaintiff, like that of the negligence of the defendant, is for the jury, where the evidence and the inferences to be deduced therefrom are such that reasonable men may arrive at different conclusions, has so often been decided by this court that the proposition has, in effect, become elementary.

In other words, if there is any substantial doubt whether a plaintiff was or was not guilty of contributory negligence, or whether, if negligent, such negligence was the proximate cause of the injury, the court cannot determine the right to recover as a matter of law, but must submit the question of contributory negligence or of proximate cause, or both, to the jury as questions of fact.

Where, however, the facts are conceded, or there is no conflict in the evidence, and upon a consideration of all the evidence, and the legitimate inferences that may be deduced therefrom, but one conclusion is per-

missible, then both questions are questions of law, and must be determined as such by the court.

While the rule just stated applies to accidents at public crossings, yet, as pointed out in *Wilkinson v. Railroad,* 35 Utah, 110, 99 Pac. 466, and in *Bates v. Railroad,* 38 Utah, 568, 114 Pac. 527, in the latter class of cases the law defines what constitutes ordinary care. In those two cases we collated and reviewed the cases, and it would be merely a work of supererogation to again re-examine and review the numerous cases upon the subject. While it is true that the traveler, in attempting to cross a railroad track at a public crossing, is required to exercise only ordinary care, yet what constitutes ordinary care under such circumstances, or, as it is sometimes termed, "the measure of duty," is prescribed by law, and therefore is not left to the whim or caprice of either court or jury. The measure of duty in such case is to look and listen, and, under certain circumstances, it may even be necessary to stop. If, therefore, the evidence discloses that the traveler has failed to comply with the duty the law imposes, and his failure is the proximate cause of the accident and injury, the law prevents a recovery.

Mr. Elliott, in his excellent work on Railroads (2d Ed.) vol. 3, section 1163, states the rule in the following words:

"Where the measure of duty is prescribed by law, and there is no controversy as to the facts, and but one reasonable inference to be fairly and justly drawn from such facts, the question whether *due care was exercised,* is one of law for the court." (Italics ours.)

Many cases in support of the text are cited by the author.

Moreover, where, as in the case at bar, the accident is observed from various points, no presumptions can be indulged either in favor of or against either party. The rule in that respect is stated in *Mynning v. Detroit, etc., Rd. Co.,* 67 Mich. 677, 35 N. W. 811, in the following words:

"This is not a case where there was no living witness of the accident; consequently there is no room for the presumption, arising from the natural instinct of self-preservation, that the deceased was exercising due care to preserve his life or person from injury."

To the same effect are *Texas, etc., Ry. Co. v. Gentry,* 163 U. S. 353-366, 16 Sup. Ct. 1104, 41 L. Ed. 186; *Rollins v. Chicago, etc., Ry. Co.,* 139 Fed. 639, 71 C. C. A. 615; 3 Elliott, Railroads (2d Ed.) section 1179b, and cases there cited.

Let us now examine the evidence produced by plaintiff in his own behalf in the light of the authorities we have cited and those referred to in the Wilkinson and Bates Cases.

The plaintiff states that he knew that he had arrived in the town of Salem, and that he had passed over the crossing in question on the day of the accident and "a few times" before that day. All those who were in the automobile with him, at least all those who testified, also admitted that plaintiff had driven the automobile over the crossing in question on the day of the accident. From their remarks, which were overheard by some of those who testified for plaintiff, and especially by Mr. Grant, they also knew and realized that they were in the town of Salem. But, entirely apart from this consideration, the plaintiff cannot be heard to say that he did not know that he had arrived in the town. Being charged with that knowledge, he was required to take notice of his surroundings. Again, it was still daylight; that is, twilight. It was still light enough to see all the surrounding objects. The town of Salem is not a large place. It is but a country village. There is but one state road passing through the town and plaintiff knew that he was traveling on that road. Indeed, that was the road he traveled both in coming to and in leaving the town of Salem. There is not the slightest evidence of anything which could have distracted plaintiff, and he claims nothing except that an automobile passed him as he was approaching the crossing in question. But, he says, he did not even know that he was approaching the crossing. It is hard to perceive how even that can be accepted as a distraction. The passing of an automobile when one is driving on the public highway is, however, such an ordinary occurrence that surely no automobile driver can urge that as a legal excuse for not paying any heed or attention to his surroundings, and especially not when he is driving in a town or populated district. But it is insisted that the passing auto-

mobile caused considerable dust to arise. Grant that. The
fact, however, is that the dust was not on the side from which
the train was approaching, and hence was not and could not
prevent the plaintiff from seeing it, had he looked. At all
events, it could not prevent him from hearing the train whis-
tle or the noise of its approach. There is another reason why
the dust cannot be urged as an excuse. All of plaintiff's wit-
nesses who were at the depot, and who saw him approach the
crossing, and who saw the collision, had no difficulty in seeing
the automobile with all of the occupants, including the plaint-
iff, although the dust was between them and the plaintiff's
automobile. Surely if they saw, he could have seen. If they
heard, he likewise could have heard, because he tells us his
senses of hearing and sight were perfect at the time.

But it is further insisted that he did not hear the train
signals nor the noise of its approach. All of the witnesses,
however, who testified in his behalf, except those with him,
heard the train whistle as it came into or passed through the
town, and they saw it and its headlight as it approached the
crossing. It is also beyond dispute that plaintiff was travel-
ing slowly and upon a level plane; that is, there was no per-
ceptible grade at or near the crossing. Nor is it claimed
that plaintiff's automobile made any perceptible noise. Nor
is there any valid reason presented why he did not hear what
the other witnesses heard. There is—there can be—but one
reason why plaintiff and those with him did not hear, and
that is that they were totally oblivious to their surroundings.
It is, however, also insisted that plaintiff did not see the
crossing and was not aware that he was approaching it or
any crossing. As an excuse in that respect, the fact that
there were no cross-arms or other similar devices placed and
maintained at the crossing to warn travelers is relied on.
The evidence, however, is undisputed, and the photographs
produced by the plaintiff clearly show, that there were trol-
ley poles, electric light poles, and telephone poles, with cross-
arms and wires, along the track, which were plainly visible
by all who looked and observed. Plaintiff, however, tells us,
and so do those who were in the automobile with him, that

they did not see any of those things. Indeed, all of those, including the plaintiff, assert that they did not see the depot, nor those who were at the depot, nor the posts that were used as a fence around the depot, nor any of the other objects which indicated their surroundings. If, therefore, neither the plaintiff, nor any one with him in the automobile, paid any attention to the surroundings, and hence saw none of the many objects there to be seen, of what possible use would an ordinary cross-arm or signpost have been to them?

While no doubt it was the province of the jury to say whether the defendant should have placed and maintained cross-arms, or some other suitable device, to apprise travelers of the crossing, yet where all who were with the plaintiff, including himself, agree that they did not see and observe any of the numerous objects which were equally indicative that there was a railroad there, how is it possible to say that, under the undisputed facts and circumstances of this case, a cross-arm, or any other signpost, would or could have been of any use whatever?

But it is asserted plaintiff did not see the track, that the railroad grade was about the same as the road grade, and that at the crossing the rails were flush with the surface of the road grade. Here again plaintiff's witnesses afford him no excuse. Mr. Grant, who was one of plaintiff's principal witnesses—at least he is the one who testified to the measurements and distances, and whose testimony seems thoroughly reliable and no doubt was relied on, and he is not contradicted in any essential particular—tells us that, although he lived nearly a block east of the crossing, he, nevertheless, could see it from his home on the evening of the accident and at about the time it occurred. It is true that Mr. Grant said that the fact was perhaps due to the other fact that he knew that the crossing was there. The controlling—that is, the essential—fact, however, is that the crossing was visible for nearly, if not quite, a block, and hence could be seen by any one who looked. It is a fact known to all that street railway tracks are always flush with the pavement or with the dirt street, yet who would be heard to say that they did

not know there was a street car track in passing over a given street?

There is, however, undisputed evidence, namely, the photographs which plaintiff produced in evidence. All of those show the crossing in question, and from them it is easy to perceive that that crossing is very much like most railroad grade crossings. While the tops of the rails on the traveled portion of the road were flush with the road grade, yet on both sides of the traveled portion of the road the rails were clearly visible for a considerable distance, and could have been seen by any one who paid only the slightest heed to his surroundings.

It is, however, insisted that both Mr. Grant's house and that of Mr. Curtis, which was further west, and was nearer to the crossing, and some outhouses, with some trees at the Grant and Curtis houses, obstructed the view of the approaching train from the south; and the stable or barn, it is insisted, also obstructed the view. Let that be conceded, and yet it furnishes no legal excuse. The barn or stable, according to Grant's measurements, was thirty-five feet from the track, and the train could be seen approaching the crossing from the south when one was ninety feet from the track. If the plaintiff, therefore, in passing over the ninety-foot space, had at any time paid the slightest attention to where he was, he must have seen or heard the approaching train.

It is, however, contended that the track curved to the west more than is indicated on the plat, and hence the rays of the headlight were cast toward the barn. Now, what are the physical, the uncontrovertible, facts in that regard? Let us assume that the train was approaching the crossing at the rate of thirty miles an hour, and that plaintiff's automobile was approaching it at ten miles an hour. The train would thus move three times as fast as plaintiff's automobile, and while plaintiff was moving ninety feet, from the point where he could first have seen the approaching train, to the track where he was struck, the train moved three times that distance, or 270 feet. The train, therefore, was only 270 feet from the crossing when plaintiff came in full view of it.

Every one knows that, if he had paid any attention whatever to where he was, he must have both seen and heard the train at such a short distance. If it be assumed that the plaintiff traveled slower, and that the train moved faster, it still leaves plaintiff in no better situation. It only makes it clearer that he gave no heed to his surroundings nor to where he was going. The law does not excuse such heed-lessness, not to say recklessness. True, one may permit himself to forget his duty to himself and to his fellow men; but, if such forgetfulness results in injury to another or to himself, he, and not another, must bear the consequences. *Farnon v. Silver King, etc., Co.*, — Utah, —, 167 Pac. 675. Suppose there had been a child on or near the crossing, and plaintiff had run over it with his automobile, and had maimed or killed it. Could he now be heard to say that he did not know the child was there, and that he did not know that he was where children might be? It may be said however, that he owed a duty to the child, and hence was required to keep a proper lookout for it. The answer, however, is obvious, namely, that he also owed a duty to take due care for his own safety while passing over a public highway, and especially in a populated town or district. Let us assume that in this case the trainmen had complied with every provision of the law in operating the train and in approaching the crossing, and the plaintiff had, nevertheless, heedlessly passed on to the crossing ahead of the approaching train, and he thus had succeeded in wrecking the train and had injured the trainmen. Could he be heard to say that he paid no attention to where he was driving at the time? Again, could a jury excuse and absolve him from all responsibility? We think no reasonable man would so contend.

No doubt the jury found, as they should have found, that in this case the defendant was guilty of negligence in operating its train, and they thus charged it with all the consequences of the collision, regardless of plaintiff's conduct.

That they had no right to do. Where both parties are equally negligent, the only question is whose negligence was

the proximate cause of the accident and consequent injury and damages?   Can any reasonable person arrive at any other conclusion than that the plaintiff's negli- 13, 14 gence was the proximate cause of the accident?   He tells us he could have stopped his automobile in its own length.  If, therefore, he had looked at any time after he had come within the 90-foot limit, he could have stopped his automobile and have been perfectly safe.  In that connection we have the physical fact that two of the occupants of the plaintiff's automobile alighted therefrom after they had passed the 90-foot limit and had come within a short distance of the crossing.  They saw the approaching train and saved themselves.  Plaintiff's duty was more positive than was the duty of his invited guests in the automobile. If, therefore, he had paid only slight attention where he was driving, he must, of necessity, have both heard and seen the approaching motorcar.  He had his automobile under complete control.  He was not hampered by any top or side curtains.  It was a clear and still evening.  He was therefore not in a situation like a driver with a shying horse.  He could have stopped the car at any moment and at any distance from the train.

This case is quite similar to the case of *New York, etc., Rd. Co. v. Maidment,* 168 Fed. 21, 93 C. C. A. 413, 21 L. R. A. (N. S.) 794.  That case was a case where an automobile was struck at a public crossing.  There, as here, the court says, the driver of the automobile had passed over the crossing ''that morning and several times before,'' and in attempting to cross it again was struck by a passing train.  The United States Circuit Court of Appeals, in passing upon the duties of automobile drivers in attempting to cross railroad tracks on public highways or streets, in the course of the opinion, makes the following pertinent observations, which in view of their timeliness and applicability, we take the liberty of quoting, namely:

''With the coming into use of the automobile, new questions as to reciprocal rights and duties of the public and that vehicle have and will

continue to arise. At no place are those relations more important than at the grade crossings of railroads. The main consideration hitherto with reference to such crossings has been the danger to those crossing. A ponderous, swiftly moving locomotive, followed by a heavy train, is subjected to slight danger by a crossing foot passenger, or a span of horses and a vehicle; but, when the passing vehicle is a ponderous steel structure, it threatens, not only the safety of its own occupants, but also those on the colliding train. And when to the perfect control of such a machine is added the factor of high speed, the temptation to dash over a track at a terrific speed makes the automobile, unless carefully controlled, a new and grave element of crossing danger. On the other hand, when properly controlled, this powerful machine possesses capabilities contributing to safety. When a driver of horses attempts to make a crossing and is suddenly confronted by a train, difficulties face him to which the automobile is not subject. He cannot drive close to the track, or stop there, without risk of his horse frightening, shying, or overturning his vehicle. He cannot well leave his horse standing, and, if he goes forward to the track to get an unobstructed view and look for coming trains, he might have to lead his horse or team with him. These precautions the automobile driver can take, carefully and deliberately, and without the nervousness communicated by a frightened horse. It will thus be seen an automobile driver has the opportunity, if the situation is one of uncertainty, to settle that uncertainty on the side of safety, with less inconvenience, no danger, and more surely than the driver of a horse. Such being the case, the law, both from the standpoint of his own safety and the menace his machine is to the safety of others, should, in meeting these new conditions, rigidly hold the automobile driver to such reasonable care and precaution as to go to his own safety and that of the traveling public. If the law demands such care, and those crossing make such care, and not chance, their protection, the possibilities of automobile crossing accidents will be minimized.''

In that case it was held that the plaintiff could not recover for the sole reason that he was guilty of contributory negligence in not paying sufficient heed to his surroundings. Such is also the case here. In view, however, of defendant's negligence, the jury in this case entirely excused plaintiff's heedlessness and visited all of the consequences of the accident upon the defendant. This the law does not sanction. Under such circumstances the courts should never forget that ''the supremacy of the law is the safeguard of the people.'' If the courts permit jurors to excuse the negligence of the

traveler one day, they may be called on to approve the verdict of a jury which excused the negligence of a railroad company on the next day, and thus the law loses its supremacy, and the matter is controlled by the whim, caprice, or peculiar sentiments of those who may be called to sit as jurors in a particular case. The only safety lies in enforcing the law which imposes the duty upon both traveler and railroad operative to exercise due care at all times, especially so when the rights and duties of both are reciprocal. In this case all reasonable persons must concede that, entirely apart from defendant's negligence, if the plaintiff had exercised that ordinary care, prudence, and foresight which the law requires of every one for his own safety while traveling on a public street or highway, the accident could not have happened. He not only owed the duty of exercising ordinary care for his own safety, but he especially owed that duty to his invited guests in the automobile. He utterly failed to meet the requirements of the law, and now seeks to visit the consequences of his own carelessness upon the defendant. This the law does not permit, and it is the duty of courts to enforce the law without fear or favor. We concede that the law operates somewhat harshly. That, however, is due to the law as it now exists in this jurisdiction. It no doubt would be more just in cases of this kind where both parties are guilty of negligence in using public crossings to apportion the damages in proportion to the fault of each, as is the case in the state of Florida. See Florida Gen. Stat. 1906, section 3149. The statute is rigidly enforced as appears from the case of *Atlantic Coast, etc., Ry. Co. v. Weir,* 63 Fla. 69, 58 South, 641, 41 L. R. A. (N. S.) 307, Ann. Cas. 1914A, 126, where a judgment against the railroad company was reversed because the jury failed to apportion the damages. It was there held that the plaintiff was guilty of contributory negligence as a matter of law.

It follows that the court erred in refusing to direct a verdict for the defendant, and the judgment therefore should be, and it accordingly is, reversed, and the cause is remanded to

the district court of Salt Lake County, with directions to grant a new trial. Defendant to recover costs.

McCARTY, CORFMAN, THURMAN, and GIDEON, JJ., concur.

On Application for Rehearing.

FRICK, C. J.

Plaintiff's counsel have filed an application for rehearing in which they contend that we have arrived at an erroneous conclusion. The principal grounds are that we were in error in stating that the dust which was caused by the automobile which passed the plaintiff after he had arrived in the village of Salem "was not on the side from which the train was approaching," and that we failed to consider the last clear chance doctrine. While it is true that the quoted statement is not strictly correct, yet it is also true that the statement was only made in connection with the contention that plaintiff's attention may thereby have been distracted and his view of the on-coming train obscured. The reasons why that incident was insufficient to excuse the plaintiff are, however, clearly shown in the opinion. What is of more importance, however, is that the conclusion reached was not based on that statement. The statement was urged merely as a subordinate and not as a controlling reason. The conclusion is based entirely upon plaintiff's own conduct in approaching the crossing while driving his automobile. In view of all the facts there is—there can be—no valid legal excuse for his conduct, and no amount of argument can furnish such an excuse. To establish such an excuse is the burden of counsel's argument in support of the application for a rehearing.

In driving his automobile the law imposed a positive duty upon the plaintiff, precisely as it imposed a positive duty upon the defendant in operating its train. It is manifest from the record in this case that neither discharged the duty imposed by law, and hence, as against each other, the law affords no relief.

Since writing the original opinion our attention has been called to the following very recent cases, which most strongly support the doctrine laid down in the federal case quoted from in the opinion, namely, *Williams v. Iola Electric R. Co.*, 102 Kan. 268, 170 Pac. 397; *Cathcart v. Oregon W. R. & N. C. Co.*, 86 Or. 250, 168 Pac. 308. In the last case cited it is said:

"An automobile properly managed is susceptible of control within very narrow limits. It will stay where it is put. It is not to be frightened, yet, unless controlled, it is an engine of great danger, and the larger question of safety to the public and travelers upon trains requires that one operating such a machine should carefully look upon the track itself where a railway train may be expected, if there be opportunity to so inspect the situation. The motorist who neglects this plain duty is guilty of contributory negligence as matter of law."

The conclusion in the case at bar is based upon the broad ground that the plaintiff manifestly failed to comply with that duty.

There is no merit to the further contention that we failed to give plaintiff the benefit of what is termed the last clear chance doctrine. It is too clear for argument that, under the facts and circumstances of this case, that doctrine has no application. Even if counsel's contention be conceded, that the motorman could have seen the plaintiff as soon as he passed into view after passing the barn, yet there is absolutely nothing in the record which would have intimated to the motorman, or to any one else, that the plaintiff would not stop his automobile while he was still a safe distance from the track.

There is nothing in the application for rehearing requiring re-examination of either the facts or the law, unless we are disposed to lay down the broad doctrine that one who approaches a railroad crossing with an automobile may do so without exercising any care for his own safety. That we are not prepared to do.

The petition is denied.

McCARTY, CORFMAN, THURMAN, and GIDEON, JJ., concur.