## MALIZIA v. OREGON SHORT LINE R. CO.

No. 3263. Decided Dec. 27, 1918. (178 Pac. 756.)

1. RAILROADS—ACCIDENT AT CROSSING—NEGLIGENCE—EVIDENCE. In action for death of a bicyclist at a public street crossing, evidence *held* to justify finding of actionable negligence. (Page 130.)

2. RAILROADS — CROSSING ACCIDENT — DEGREE OF CARE — CUSTOMARY ACTS. Where neither trainmen, deceased employee, nor any of his coemployees paid any attention to gates at public crossing, even when they were down, it was the duty of those operating trains over the crossing to exercise great care and caution. (Page 131.)

3. RAILROADS — CROSSING ACCIDENT — CONTRIBUTORY NEGLIGENCE — QUESTION FOR JURY. While it is the duty of one about to cross a railroad at a public crossing to keep a vigilant lookout for approaching trains, whether such duty has been met is, except in clear cases, a jury question. (Page 131.)

4. RAILROADS — CROSSING ACCIDENT — CONTRIBUTORY NEGLIGENCE — QUESTION FOR JURY. Whether, under a particular state of facts and circumstances, a traveler about to cross a railroad at a public street crossing may be excused from maintaining a constant lookout in a particular direction is, except in clear cases, a question of fact. (Page 131.)

5. RAILROADS — CROSSING ACCIDENT — CONTRIBUTORY NEGLIGENCE — QUESTION FOR JURY. In action for death of bicyclist at a public

street crossing, whether injuries were entirely due to decedent's own negligence *held*, under the evidence, for the jury. (Page 132.)

6. APPEAL AND ERROR—CONCLUSIONS OF JURY—REVIEW. Where court on appeal, as triers of fact, might entertain doubts as to whether conduct of deceased in passing in front of defendant's engine in going over a public crossing was excusable, it will yield to the judgment of the jury.[1] (Page 132.)

Appeal from the District Court of Salt Lake County, Third District; *Hon. Geo. F. Goodwin*, Judge.

Action by Filomena Malizia against the Oregon Short Line Railroad Company.

Judgment for plaintiff. Defendant appeals.

AFFIRMED.

*George H. Smith, J. V. Lyle* and *B. S. Crow* for appellant.

*Wedgwood, Irvine & Thurman* for respondent.

FRICK, C. J.

Plaintiff in her complaint, in substance, alleged that she was the duly appointed administratrix of the estate of one Natale Malizia, deceased; that said Natale Malizia was killed in March, 1917, through the negligence of the defendant, by being run over by a locomotive engine of the defendant on one of the public street crossings in Salt Lake City; that said Malizia left surviving him the plaintiff and six children, the youngest of whom was three months old, while the oldest was eleven years of age. The acts of negligence charged, in substance, are: That although the defendant maintained gates across Fifth North street in said city to warn travelers and to prevent them from passing over said crossing when it was being used by passing trains, nevertheless on the date aforesaid, it negligently and heedlessly failed and neglected to lower said gates and to keep them closed at a time when three

---

[1] *Newton* v. *Railroad Co.*, 43 Utah, 219, 134 Pac. 567.

locomotive engines, hereinafter called engines, were passing in one direction, and a train of passenger cars was passing in the opposite direction over said crossing; that although the said three engines were passing in one direction and said train was passing in the opposite direction over said crossing, yet the defendant, in approaching said crossing with said three engines, negligently failed to keep a proper lookout from said engines to observe and warn persons who might attempt to pass over said crossing; that the defendant negligently failed to have an engineer and fireman on the front one of the said three engines, and that the said front engine was in charge of and was operated by the fireman alone, and without giving warning to the persons at said street crossing, nor to the deceased. There are various other allegations respecting the noises made by said engines and said passenger train, which was propelled by a large switch engine, and the confusion arising therefrom, etc.

The defendant admitted that the deceased was struck by an engine and killed, but denied all acts of negligence on its part; and, as an affirmative defense, averred that the injuries to and death of the deceased were caused by the negligent acts and omissions of the deceased, which acts and omissions were fully set forth.

Upon substantially the foregoing issues a trial to a jury resulted in a verdict in favor of the plaintiff. Judgment was duly entered on the verdict, from which this appeal is prosecuted.

There are only two questions presented for decision: (1) That there is no evidence justifying a finding of actionable negligence on the part of the defendant; and (2) that the evidence without conflict shows that the injuries causing the death of the deceased were entirely due to his own negligent acts and omissions, which acts and omissions are stated in the answer.

The following sketch will, at least to some extent, aid the reader to a better understanding of the facts:

The four lines marked "A," "B," "C," and "D," respectively represent four tracks of the defendant passing over

Fifth North street where that street intersects with and crosses Fourth West street. The four tracks, by means of switches, branched off in the shape of a fan immediately north of the sketch. There are at least twelve different tracks which lead to the defendant's roundhouse and storage yards, where a large number of men, including the deceased, were being employed by the defendant at the time of the accident. Some of the employees lived to the south, southwest, and west of the crossing in question, and in passing north to their work in the morning would pass over the crossing and over the four tracks indicated on the sketch. The broken

line running east and west on the crossing indicates the center of the traveled portion of the street. Both Fourth West and Fifth North streets are 132 feet wide. By keeping this in mind distances will also be better understood. The traveled portion of Fifth North street at the crossing was, however, only about 35 feet in width, of which the broken line is about the center. It seems that the deceased was riding a bicycle in going to work in the morning and would pass

north along the west margin of Fourth West street, and west of the track marked "A" on the sketch, and would thence ·cross over the intersection of Fifth North street and over the tracks along the broken line, and would then pass on north to the roundhouse of the defendant. There were gates maintained on both the west and the east margin of Fourth West street where it is crossed by Fifth North street, but the gates, the evidence shows, were kept open, or up, until seven o'clock each morning. The accident in question occurred about ten or fifteen minutes before seven o'clock in the morning, and hence the gates were still open, or up. The deceased, it seems, passed along Fourth West street, as before stated, on the morning of the accident on his bicycle. Just before the accident he was seen standing still along the west margin of Fourth·West street at a point marked "X" on the sketch. A short time before the accident four engines coupled together had passed south over the crossing on one of the four tracks to a point where the engine farthest north was about 80 feet, more or less, south of the crossing. There were a number of switches called "puzzle switches" along the track south of Fifth North street. There were similar switches also to the north. These switches were all operated by an employee of the defendant who was standing in what is called the interlocking tower, indicated on the sketch by the parallelogram marked "T." The switches were called puzzle switches, it seems, because engines could be switched in either direction by them without the switches themselves indicating in what direction the engines would pass. On the morning of the accident the four engines coupled together coming from the north passed south over Fifth North street to the point before stated.

Shortly after that happened the front one of the four engines was uncoupled from the other three, and after giving the proper signals—that is, several blasts of the whistle—to the switch operator in the tower, indicating to him the particular track it was desired that the engine should pass onto, and the switch having been shifted, that engine passed back north over said crossing. A short time thereafter, some of the witnesses say about five minutes after the first engine had passed north over the crossing, the other three engines, still coupled together, after giving the necessary signals, as before stated,

to the switch operator in the tower, started north to pass over the crossing. The three engines passed over the track marked "B" on the sketch, and when the first engine had reached a point perhaps a little south of the letter "B" on the track aforesaid it ran over and killed the deceased. All of the front engine and part of the tender of the second one passed over him. At the very moment that the three engines, coupled together as before stated, passed north on, to, and over the crossing a train consisting of twelve or fourteen passenger cars, drawn by a large switch engine, passed south on the track marked "C" on the sketch. The three engines were running at a rate of speed of about five or six miles an hour, while it is not clear at what rate of speed the train was running. The bells were ringing on the three engines and on the switch engine going south drawing the train of cars, and there was considerable noise caused by the movement of the three engines and the engine and train going south. The evidence shows that the switch engine which was drawing the train of cars was laboring hard, and in exhausting steam it made much noise. The evidence also shows that the engineer of the front one of the three engines going south over the crossing had left the engine in charge of his fireman, who, however, was quite competent to operate the engine. No claim is made that the fireman was not competent. The fireman, in moving the engines northward, was thus left alone on the front engine. He was on the east side of the engine going north, looking out of the cab window, and hence could not see any one coming from the west toward the tracks, unless the person so coming was some distance ahead of the moving engine. We here insert the statements of some of the witnesses as their statements appear in appellant's abstract. The fireman testified:

"I was running from the front engine at the time of the accident. When I returned from getting the bag of water, I got on the engine, answered the board, two short blasts of the whistle, started the bell ringing, and proceeded north. Just as I got a short distance from the crossing these coaches with the engine pulling them started south on the next track to us, and then, as the front end of my engine was on the crossing, there was a man, Mr. Tujios, stepped across directly in front

of the engine—stepped almost on the rail. He was following the engine, and I hollered at him, and he stepped off the rail, just one or two steps, rather rapid, of course, when he heard me. By that time I was nearly even with him, and he looked up at me, then he looked down underneath the engine, and gave me the stop sign. That is given by the arms. I could feel something underneath the engine; I didn't know what it was. Of course I tried to stop as soon as possible, blowed the whistle, and reversed the engine and set the brakes; that is, I did all of these things about all together. Tujios was a little ahead of me when I blew the whistle, and we stopped about an engine's length after that. As soon as he gave me the stop sign I reached for the whistle with one hand and brake with the other. Up to that time I had run an engine from three to. five or six hours a day for every engineer that I have fired for, and had been firing nearly two years. At the time Tujios gave me the stop sign I could not see any man on the track. From where I sit in the cab I cannot see a man in the middle of the track immediately in front of the engine, not within about ten or fifteen feet from the front of the engine. The boiler projects far enough ahead to cut off the view to a point about ten feet ahead of the engine. I can see the right-hand rail, and the left-hand rail about sixty feet ahead of the foot-board. I had seen these men passing on ahead of the engine on this particular morning; I don't know how many or who. At the time I approached this crossing up to the time the accident happened I was looking straight ahead. I was leaning on the arm rest, looking out of the window of the cab.''

The engineer on the second engine, among other things, said:

''Our engines were traveling north on the track indicated on the map in red (B) and in my judgment the front engine came to about twenty-five feet from the crossing, when I saw a man on a wheel attempting to cross in front of the engine. This was the last man on a wheel, and he attempted to cross about twenty or twenty-five feet in front of the head engine. I thought he had ample time to get over. There was no man with him. Several men, strung out, had gone just ahead of him on foot. This man was riding his wheel and was going

fast. All three bells were ringing and we were going about
five or six miles an hour. I could not see the string of coaches
coming down in the opposite direction. They were on the other
side of the engine. These three engines had backed up there
prior to that time. Immediately after this man attempted
to cross in front of the engine there was one sharp blast of
the whistle and stopping of the locomotives. One short blast
is the signal to stop. The engines stopped within an engine's
length after the first blast of the whistle; that is, about fifty
feet. It was a common occurrence to see men pass over in
front of the engines when we steam up toward the yards. As
to the gates being up or down I couldn't say. Prior to this
time we had never run into any of these men. I am an en-
gineer. Have been an engineer about six months, and was
promoted from a fireman to that position. I learned to run an
engine while I was firing.''

One Tujios, the only witness who, it seems, saw the deceased
struck by the engine, testified as follows:

''On the morning of the accident I came down Fifth North
street and I saw Nate Malizia, who came up Fourth West. I
left Nate Malizia right at the corner when I went over towards
the track. I walked over in the track, and stayed right here
on the other side of the red track (track B). I understand a
little of the map. I watched the engines coming up. I looked
the other way too. When I left Nate Malizia over at the
crossing I went over to the red track (Track B). When I saw
the engine coming I was on the side of the tracks. When Nate
Malizia was struck I was right there between the four tracks
on the side of the tracks. I did not jump out from between the
rails. The last I saw Nate Malizia before he got struck was
over on the sidewalk. I left him there, and went over to the
track here, and I stayed there about ten seconds, when I
looked around and saw him under the front of the engine. He
was under the front of the engine, and his wheel too. When
I saw him tip over in front of the engine I gave the signal to
the engineer to stop. I was watching train coming up; just
turned around and look at engine. I heard the bell all right;
there was lots of noise. When I looked up and saw the en-
gines I was about twenty feet from them. When I first got

there I saw the engines away up, starting to go down. They were about eighty feet from me and coming towards me. When I next looked they were three feet or so from me. I just started to look back and heard a noise; some man hollered —the engine tipped him over. There was no one else there at the time I was.''

One of the defendant's engineers, in speaking of the condition that prevailed at the crossing on the morning and at the time of the accident, said:

''The condition that morning at the crossing was not the usual and ordinary condition. It is dangerous for a man to go between the two trains under any circumstances when two trains are passing. I knew that on that morning and knew the conditions were unusual. * * * During the three months prior to this time it was infrequent that a train consisting of twelve to fourteen coaches passed down that third track from the west across the crossing at the same time we were going up. I could not say how many times. In fact, the condition which existed on the crossing at the time the accident happened was infrequent.''

There was more evidence to the same effect. The foregoing is, however, quite sufficient to show the conditions surrounding the deceased just preceding and at the time of the accident.

In view of the foregoing evidence we cannot agree with appellant's counsel that we ought to say, as matter of law, appellant was not guilty of any negligence, and that if it be assumed, however, that it was, such negligence was not the proximate cause of the accident. We agree with counsel, however, that, in so far as the accident in question is concerned, the keeping up of the gates at the crossing is entirely immaterial. The evidence is undisputed that neither the deceased nor any other of the employees of the defendant paid any attention to the gates, and even when they were down or closed the employees would, nevertheless, pass under or around them and pass on and over the crossing. Moreover, the evidence is to the effect that on the morning in question the deceased came north on Fourth West street, and, as it seems, was inside of the gates. In no event, therefore,

did the condition of the gates have any effect on what occurred.

The fact, however, that neither the trainmen nor the deceased, nor any of his co-employees, paid any attention to the gates, and all of which was known to those operating the engines and trains, made it necessary for both those who operated trains over the crossing as well as those who passed over it, either on foot or on bicycles; as did the deceased, to exercise greater care and caution in using the crossing. In the face of that fact the fireman was left alone on the front engine to keep a lookout for and to warn such persons as might attempt to pass over the crossing. He, as a matter of course, just as is disclosed by the undisputed evidence, could keep a lookout only from one side of the engine, which was the side opposite to the one from which the deceased approached the tracks. It is obvious to every one, therefore, why the fireman in charge of the engine did not see the deceased at all, and why he did not know that he was under the engine until he was informed by the witness Tujios. It is manifest, therefore, that no effective lookout was maintained from the front engine. True, there was a fireman looking out of the west cab window on the second engine. He, however, could not see the track for some distance immediately ahead of the front engine because of a curve in the track to the west. His view was shut off by the front end of the front engine. But it is urged that it was the duty of the deceased to keep a vigilant lookout for approaching engines or trains; that by the ringing of the bells on all three engines he was warned of their approach, and that it was his duty to avoid being struck by those engines.

No doubt such is the law and such was his duty. Whether, in view of the circumstances, the duty imposed by law has been met is, however, except in clear cases, a question of fact for the jury.

Again, whether, under a particular state of facts and circumstances, a traveler may be excused from maintaining a constant lookout in a particular direction is also, except in clear cases, a question of fact. As we have seen, the evidence is not in dispute that the conditions prevail-

ing at the crossing at the time of the accident were un-
usual. Defendant's counsel, however, insist that there is no
evidence showing that the attention of the deceased was di-
verted elsewhere except to the engines passing over the cross-
ing, nor that his mind was distracted, or that he was con-
fused by anything that occurred at the time. True, no wit-
ness directly testified to that fact; but that is not the test. In
determining that fact it is the duty of the jury to consider all
the facts and circumstances disclosed by the evidence. What,
then, are the facts and circumstances in this case? In the
first place, the jury had the right to consider the fact that
one of the four engines had passed over the crossing to the
north; that the deceased, in all probability, had noticed that
engine pass over the crossing, and that he may have assumed
that the other three would not pass to the north, at least not
immediately. In the second place, that the deceased, with
that fact in mind, may have passed on eastward over the
tracks, but at that moment the train of passenger cars com-
ing from the north, and passing south over the crossing on
track "C," may have engrossed his attention, and while he
was in that situation was struck by the front one of the three
engines passing north.

Now, whether the deceased should have acted differently,
in view of all the circumstances, and whether what occurred
at the time was sufficient to excuse his conduct in at-
tempting to cross the tracks, were all questions for the
jury to solve, and cannot be determined either for or
against him as questions of law. To say that but one con-
clusion, namely, that the deceased was guilty of negligence
barring a recovery, is permissible, is, to our minds, ignoring
many things which may affect human conduct under particu-
lar circumstances.

While as triers of fact we might entertain doubts whether
the conduct of the deceased in passing in front of the front
engine under the circumstances disclosed by the evi-
dence, was excusable or not, yet it is that very doubt,
as was said in *Newton* v. *Railroad Co.*, 43 Utah, 219,
134 Pac. 567, which makes it a question for the jury, and
which requires us to yield to their judgment. This case does

not fall within the principle which controlled the cases of *Tremelling* v. *Southern Pac. R. Co.*, 57 Utah, 189, 170 Pac. 80; *Teakle* v. *Railroad*, 32 Utah, 276, 90 Pac. 402, 10 L. R. A. (N. S.) 486; *Wilkinson* v. *Railroad*, 35 Utah, 110, 99 Pac. 446; *Bates* v. *Railroad*, 38 Utah, 568, 114 Pac. 527; and *Kent* v. *Railroad*, 50 Utah, 328, 167 Pac. 666; but it falls within the doctrine laid down in *Newton* v. *Railroad*, supra, namely, that where the facts and circumstances are such as to justify fairminded men to arrive at different conclusions with respect to the question of negligence on the part of the defendant, or with respect to contributory negligence on the part of the injured person, or with reference to whether the negligence of the one or the other was the proximate cause of the accident, the case is one for the jury and not for the court. We can see no escape from the conclusion in this case that, in view of the facts and circumstances, it was proper to submit it to the jury.

The judgment is therefore affirmed, respondent to recover costs.

CORFMAN and GIDEON, JJ., concur.

McCARTY, J., died after the submission of this cause and before the filing of this opinion.

THURMAN, J., did not participate in the hearing of this cause.